**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICK DUANE BENEDICT**, | : | Case No. 1:13-CV-02026 |
| Plaintiff, | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY | : | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION**. |
| Defendant. | | |

## I. INTRODUCTION.

Plaintiff seeks judicial review of Defendant's final decision denying his claim for

Disability Insurance Benefits (DIB) under Title II the Social Security Act (Act).  His case has

been automatically referred to the undesigned Magistrate Judge for report and recommendation.

Pending are the Briefs on the Merits filed by the parties and Plaintiff' Reply (Docket Nos. 12, 13

& 14 ).  For the reasons that follow, the undersigned Magistrate recommends that the Court

reverse and remand the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).

## II. PROCEDURAL BACKGROUND.

On June 4, 2010, Plaintiff, with the assistance of the Social Security Administration,

completed an application for DIB alleging that he became unable to work because of his disabling

condition on February 1, 2009 (Docket No. 11, pp. 171-173 of 821).  The application was denied

initially on February 1, 2011 and upon reconsideration on April 13, 2011 (Docket No. 11, pp. 113-

116; 120-122 of 821).  On March 29, 2012, Administrative Law Judge (ALJ) Valencia Jarvis held

a video hearing, at which Plaintiff, represented by counsel, and Vocational Expert (VE) Steve T.

Davis, appeared (Docket No. 11, p. 34 of 821).  On May 4, 2012, the ALJ issued an unfavorable

decision, finding that Plaintiff had not been under a disability as defined in the Act from the date

his impairment began through the date of the ALJ's decision (Docket No. 11, pp. 14-27 of 821).

The ALJ's decision became the final decision of the Commissioner when the Appeals Council

denied review of the ALJ's decision on July 17, 2013 (Docket No. 11, pp. 5-7 of 821).  Plaintiff

timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision

denying benefits (Docket No. 1).

### III. PLAINTIFF'S TESTIMONY.

Plaintiff was 55 years of age and he weighed 285 pounds.  He was married and had two

children, both of whom were attending college-level institutions (Docket No. 11, pp. 39; 47; 48

of 821).  Plaintiff's spouse was employed outside of the home, working three jobs.  The family was

eligible for supplemental nutrition assistance (Docket No. 11, pp. 55; 59 of 821).

Plaintiff admitted to cocaine use in his youth but denied any existing problem with drug

dependence (Docket No. 11, pp. 62-63; 64-65 of 812).  Plaintiff identified the following medically

determinable impairments for which he was undergoing treatment:

- Arthritis.
- Congestive heart failure (CHF).
- Depression.
- Diabetes and diabetic neuropathy.

- Sleep apnea[1].
- Spinal pain.

1. **ARTHRITIS**.

Plaintiff had severe arthritis in his neck and back (Docket No. 11, p. 40 of 821).

2. **CHF.**

A common symptom of CHF was edema in Plaintiff's legs, feet and ankles (Docket No. 11, p. 40 of 821).

3. **DEPRESSION**.

Plaintiff had no medical insurance and he relied upon his primary care physician, Dr. Gregory C. Brandt, D.O., to prescribe medications indicated in the treatment of depression and monitor his progress.  Although he had no recent hospitalizations or depressive bouts, Plaintiff opined that his condition would worsen without medication (Docket No. 11, pp. 55; 56; 59; 60; 61 of 821).

4. **DIABETES MELLITUS**.

Plaintiff had diabetes which was controlled with a daily injection of insulin supplemented by Metformin, a medication used to treat high blood sugar levels.  He had diabetic neuropathy "really bad" (Docket No. 11, pp. 40; 60 of 821).

5. **SPINAL PAIN**.

Plaintiff's "biggest impairment" was a degenerative spinal disease which occasionally caused sciatica pain.  Because of his pain, Plaintiff estimated that he could only sit for fifteen minutes and then stand without pain shooting through his sciatic nerve.  He saw a pain

---

[1]

Plaintiff did not discuss sleep apnea as a severe impairment, any treatment he was undergoing or the affect that such impairment had on his quality of life.

management specialist once monthly and he participated in physical therapy.  Plaintiff had undergone lumbar epidural injections and taken Percocet, an opiod analgesic, daily to "take the edge off."  In addition, he tried lying on his side and elevating his body for pain relief (Docket No. 11, pp. 40; 42-43; 45; 57; 61-62 of 821).

6.    **THE EFFECT OF PLAINTIFF'S IMPAIRMENTS ON DAILY ACTIVITIES AND FUNCTIONAL LIMITATIONS**.

Plaintiff described his quality of life as poor.  His wife helped him get to the edge of the bed, get out of the bed, shower and dress.  Plaintiff did nothing more than walk around inside and outside of his house, stopping periodically to rest.  His wife and/or children performed all of the household chores including the lawn care (Docket No. 11, pp. 41; 43; 66 of 821).

Plaintiff explained that he had to stand to relieve the pain after sitting for up to five minutes[2].  Plaintiff suggested that he could walk for up to seven minutes before he had to sit and he could stand for fifteen minutes.  Plaintiff no longer drives based on the recommendation of his physician (Docket No. 11, pp. 41-42; 48-49 of  821).

Except for his spouse and children, Plaintiff had minimal contact with the outside world.  None of his friends came to visit because he was generally in a foul mood (Docket No. 11, pp. 43; 44; 65-66 of 821).

7.    **PLAINTIFF'S EMPLOYMENT HISTORY.**

Plaintiff was last employed in February 2009 at Avery Dennison making pressure sensitive label stock and adhesive film.  He estimated that during an eight-hour workday, he walked three hours; stood three hours and sat two hours.  The heaviest items lifted weighed fifteen pounds.

---

[2]

At this juncture in the hearing, counsel requested leave for Plaintiff to stand.

4

Plaintiff was laid off and then returned to work for a few months.  Plaintiff never returned to work after having heart surgery (Docket No. 11, pp. 49; 50; 51; 52 of 821).

## IV. THE VE'S TESTIMONY.

The VE, a professionally credentialed disability specialist, averred that he was familiar with the jobs that exist in the national economy and the State of Ohio and that unless otherwise noted, his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT)[3] (Docket No. 11, pp. 69; 158 of 821; www.occupationalinfo.org).

Summarizing Plaintiff's past relevant work performed fifteen years prior to March 29, 2012, the VE determined that from 1990 through 2007, Plaintiff was employed as a carpenter. Self-taught, Plaintiff skills were not commensurate with a journeyman carpenter; yet, he managed to make a living.  When installing signs, Plaintiff had operated a cherry picker to lift the signs (Docket No. 11, pp. 69-70; 71 of 821).  The VE categorized these jobs and Plaintiff's other past relevant work at the exertion and skill levels at which Plaintiff actually performed them and the attendant specific vocational preparation time (SVP)[4]:

| Job/DOT | Work type | SVP |
| --- | --- | --- |
| Carpenter 860.3810922 | **Medium work** means that you can stand and walk for up to six hours in an eight- hour day and lift twenty-five pounds frequently and fifty pounds occasionally.  20 C.F.R. § 404.1567(c). | 5-over six months and up to and including one year. |
| Cable television installer 821.281-010 | **Heavy work** involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  20 C.F.R. § 404.1567(d). | 5- |

---

[3]

This publication provides universal classifications of occupational definitions and how the occupations are performed.

[4]

The amount of time required by the typical worker to learn the techniques, acquire the information and develop the facility for average performance of the specified job.  Www.ontonline.org.

| Machine Operator/ coder 509.382-010 | Medium | 4--over three months and up to and including six months. |
|---|---|---|
| Optician delivery driver 905.663-014 | Medium | 4 |
| Sign installer 859.684-054 | Performed as **light work** which involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(d). | 3--one month and up to and including three months. |
| Metal finisher 705.684-038 | Performed as medium work | 4 |
| Gluer 794.687-030 | Performed as heavy work | 2--anything beyond a short demonstration up to and including one month. |

(Docket No. 11, pp. 72-73; 74 of 821).

The ALJ posed the <u>first</u> hypothetical to the VE:

Assume an individual of the same age, education and work experience as Plaintiff; limited to work at the light exertional level; sitting six out of an eight-hour workday; standing and walking also six out of an eight-hour workday; this individual would perform unlimited pushing and pulling; would be limited to frequent with respect to climbing of ramps, stairs and occasionally climbing ladders, rope, scaffolds; only occasionally stooping; this individual would also require work that did not require strict production quotas and they would have superficial interaction with the public, co-workers and supervisors.

The VE opined that this hypothetical person could not perform Plaintiff's past relevant work of machine operator/coder as it was performed because the individual would be required to stand and walk more than six hours.  The individual could perform the precious metal coder, as classified in DOT, not as Plaintiff performed it.

Additionally the following *light, semi-skilled* jobs would be available to the hypothetical person who met the descriptions provided in hypothetical one:

6

| Jobs/DOT | Nationally | State of Ohio |
|---|---|---|
| Trimmer of jewelry 705.682-010 | 51,900 subject to 25% erosion. | 1,100 subject to 25% erosion. |
| Coding Machine Operator 554.685-014 | 30,000 subject to 25% erosion. | 1,200 subject to 25% erosion. |

(Docket No. 11, pp. 74-75 of 821).

The number of *light, unskilled* jobs are available as follows:

| Jobs/DOT | Nationally | State of Ohio |
|---|---|---|
| Pay worker --bench worker 734.687-014 | 549,000 | 63,000 subject to 25% erosion |

(Docket No. 11, p. 75 of 821).

The ALJ posed the second hypothetical to the VE:

Assume the same individual, same age, same educational background and work experience, except that this person could not perform any lifting more than five pounds on an occasional basis; is only able to stand and walk for fifteen minutes on an occasional basis; is only able to stand and walk for fifteen minutes at a time; sit for fifteen minutes at a time; cannot perform any bending, lifting, carrying crawling, squatting or climbing of stairs or ladders.

The VE explained that relying on these limitations, there would be no other work for such an individual (Docket No. 11, pp. 76-77 of 821).

## V. MEDICAL EVIDENCE.

Plaintiff's wide range of medical issues relates back to his involvement in a motor vehicle accident on October 17, 2001.  Thereafter, Plaintiff presented to Dr. Gregory C. Brant, D.O., a specialist in osteopathic manipulative therapy, with complaints of pain in his neck, shoulders, left dorsal and lumbar areas of the back and numbness in the tips of his left fingers.  For the next seven months, Dr. Brant treated Plaintiff for disorders ranging from back pain to a sore throat (Docket No. 11, pp. 709-729 of 821; www.healthgrades.com/physician/dr-gregory-brant).

On May 7, 2007, Dr. Gary A. Mellick, D.O, considered whether there was a biochemical or structural source of Plaintiff's bilateral leg pain.  Upon completing mental status, cranial nerve, motor strength, reflex and musculoskeletal examinations, Dr. Mellick concluded that Plaintiff had chronic pain in the muscles in unrelated parts of his body and diabetic peripheral damage to multiple nerves in roughly the same areas.  He also noted that:

- Plaintiff did not sleep well without taking Percocet.
- Plaintiff's memory was intact for recent, remote and immediate events.
- Plaintiff had normal auditory acuity.
- Plaintiff had normal mass and muscle tone in all muscle groups.
- The activity of reflexes was within the normal range.
- Plaintiff tested negative for central nervous system damage.
- Plaintiff's cerebellar testing results were normal

(Docket No. 11, pp. 394; 395 of 821).

An X-ray examination of Plaintiff's feet conducted on May 9, 2007, showed no evidence of displaced fracture, dislocation, joint space narrowing, calcaneal spurs or soft tissue calcification bilaterally.  On May 14, 2007, Plaintiff underwent a magnetic resonance imaging (MRI) of the lumbar spine and an Arterial Doppler (AD) study of Plaintiff's lower extremities.  Results from the MRI showed a grade one condition in which the bone in Plaintiff's spine had slipped out of the proper position onto the bone below it, secondary to chronic arch fractures featuring these changes at other levels.  Results from the AD Study showed minimal evidence of occlusive arterial disease of the bilateral lower extremities (Docket No. 11, pp. 324-325; 418; 504 of 821 www.drugs.com).

An MRI of Plaintiff's ankle administered on May 21, 2007, showed mild tendinosis of the Achilles tendon (Docket No. 11, pp. 322-323 of 821).  On May 25, 2007, Plaintiff underwent a nerve conduction study but refused the needle examination, thus, limiting the interpretation of the results.  The results did suggest the presence of peripheral damage to multiple nerves in roughly the same area (Docket No. 11, pp. 498-499 of 821).

The results from a comprehensive metabolic study conducted on July 31, 2007, showed that Plaintiff's glucose, cholesterol and low-density lipoprotein levels exceeded the levels most prevalent in a reference group taken from the population that appear to have optimal health (Docket No. 11, pp. 428; 437 of 821).

On August 6, 2007, Dr. Anju Varanasi, M.D., a family practitioner and internist, treated Plaintiff's ongoing problem with lower back pain.  During the course of her examination, Dr. Varanasi noted that Plaintiff had chronic elevated blood sugars and uncontrolled hypertension (Docket No. 11, p. 383 of 821).  Plaintiff's blood sugar and blood pressure remained uncontrolled and on August 27, 2007 and September 17, 2007, Dr. Varanasi modified the drug regimen for the purpose of lowering blood pressure and regulating glucose levels (Docket No. 11, pp. 375; 377; 493; 586-587 of 821; www.healthgrades.com/physician/dr-anju-varanasi).

Plaintiff was evaluated on October 4, 2007 for physical therapy.  He self-discharged after one visit and failed to schedule further appointments (Docket No. 11, pp. 485-491 of 821).

On December 13, 2007, Dr. Varanasi modified the drug regimen again in response to Plaintiff's complaints that he had an adverse drug reaction to the medications used to treat and control diabetes and hypertension (Docket No. 11, pp. 369; 426 of 821).

Diagnosed with spondylosis with pathology of the spinal cord, Plaintiff underwent an epidural injection at L5 on December 17, 2007 (Docket No. 11, pp. 259; 794-796 of 821).

On January 2, 2008, Plaintiff was referred to a pain management program.  His diabetes and hypertension were controlled (Docket No. 11, p. 366 of 821).

During periods of stress, images of Plaintiff's heart taken on January 16, 2008, showed an inferior perfusion defect with either myocardial scar or hibernation.  There were septal segments consistent with stress-induced ischemia (Docket No. 11, p. 401 of 821).

9

A stress echocardiogram that replicates the effect of exercise on the heart was administered on January 16, 2008, revealing a "T-wave" abnormality in the lateral lead.  Yet, no chest pain or dyspnea developed during the test.  Plaintiff complained of onset pain once the protocol was completed (Docket No. 11, p. 402 of 821).  Concerned that the results from the stress test were abnormal, Dr. Varanasi referred Plaintiff to cardiology for further evaluation and on January 18, 2008, Dr. James N. Cho, M. D., conducted a cardiovascular examination, ordering further tests.  The results showed an abnormality in the nuclear stress test.  The echocardiography and basic metabolic tests taken on January 22, 2008, showed:

- Normal systolic function.
- Trivial mitral regurgitation.
- No significant valvular heart disease.
- Mild enlargement to the left atrium.
- Normal right ventricular systolic function and size; no right ventricular hypertension but evidence of trivial tricuspid regurgitation.
- Elevated glucose level

(Docket No. 11, pp. 360; 399; 424; 563-565 of 821).

On January 31, 2008, Plaintiff underwent coronary artery bypass grafting and laser surgery used to treat inoperable heart disease in people with persistent angina.  The postoperative evidence showed increased perihilar edema/atelectasis status post-extubation and tiny right apical collapsed lung status post chest removal tube.  In response to postoperative changes, Plaintiff's medication regimen was improved, further tests ordered for follow-up during March 2008 and Plaintiff was evaluated for physical therapy (Docket No. 11, pp. 263-264; 266; 280; 281; 282-283; 291-293; 297-299 of 821; www.nim.nih.gov).

With his cardiologist's approval, Dr. Varanasi prescribed Percocet for chronic back pain on February 11, 2008.  On February 25, 2008, she (1) ordered diagnostic tests to determine the etiology of Plaintiff's fatigue; and (2) discussed diet and its effect on Plaintiff's lightheadedness

secondary to his elevated blood sugar (Docket No. 11, pp. 357; 560 of 821).  As a prerequisite to admission into cardiac rehabilitation, Plaintiff performed the treadmill stress test on February 27, 2008.  Because (1) Plaintiff's sinus rhythm was normal at rest; (2) the test results were indeterminate for a restriction of blood supply to tissues; and (3) there was no provocation of angina, cardiac arrhythmia or stroke during the test, Plaintiff was admitted to cardiopulmonary rehabilitation with a plan to focus on medication compliance, diet, weight loss, physical therapy and stress reduction.  Upon completion of the program, Plaintiff's cardiac medications were discontinued and he was released to return to work, without restrictions, on March 28, 2008 (Docket No. 11, pp. 398; 466-480 of 821).

As a part of cardiac rehabilitation, Plaintiff underwent several diagnostic tests.

- On March 11, 2008, a comparison was made with the two posterior and lateral imaging protocols from February 3, 2008 and the results showed interval resolution of bilateral basilar dependant atelectasis and stable appearance of a mild enlarged heart (Docket No. 11, pp. 262; 265 of 821).
- On March 20, 2008, the Doppler signs confirmed that there was no blood clot forming in a deep vein and no superficial vein inflammation related to a blood clot in the left upper extremity (Docket No. 11, p. 397 of 821).
- On March 25, 2008, Plaintiff's diabetes and hypertension were stable.  He was referred for neurological study of the left thumb numbness and tingling (Docket No. 11, p. 549 of 821).

On April 1, 2008, Plaintiff was treated for soft tissue swelling in his left forearm.  The X-ray confirmed the presence of metallic clips in the soft tissue as first observed during an X-ray on March 25, 2008.  Dr. Varanasi referred Plaintiff to a surgeon (Docket No. 11, pp. 347; 410 of 821).  The MRI administered on April 3, 2008, showed evidence most compatible with a subacute hematoma in the left forearm.  The radiologist suggested vigilance and further diagnostic testing in six months (Docket No. 11, p. 261 of 821).

Plaintiff self-referred to Dr. Farid Talih, M. D., for treatment of anxiety and depression.

11

Using the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM), a publication of the American Psychiatric Association that offers a common language and standard criteria for the classification of mental disorders and psychological diagnosis after evaluation, Dr. Talih addressed the basis for Plaintiff's depression and made the following diagnoses effective May 9, 2008:

| AXIs | WHAT IT IS | WHAT IT MEASURES | DR. TALIH'S APPLICATION TO PLAINTIFF |
|---|---|---|---|
| I | Clinical disorders. | This is what the clinician actually thinks of as the diagnosis | Depression; Acute adjustment disorder |
| II | Developmental disorders and personality disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood. Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world. They include Paranoid, Antisocial, and Borderline Personality Disorders. | Deferred. |
| III | Physical conditions. | Which play a role in the development, continuance, or exacerbation of Axis I and II Disorders. | Status post cardiac bypass. |
| IV | Psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Moderate to severe marital problems. |
| V | Highest level of functioning is aptly categorized in the Global Assessment of Functioning (GAF), a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. | On the final axis, the clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Plaintiff's overall GAF is 45, a score that denotes the presence of serious symptoms or serious impairment in social, occupational or school functioning. Plaintiff's functional severity is at 65, a score that denotes some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty. |

(Docket No. 11, pp. 312-313 of 821; www.healthgrades.com/physician/dr-farid-talih).

Dr. Varanasi noted on May 19, 2008, that Plaintiff's diabetes and hypertension were controlled but he had developed shoulder pain, left thumb numbness and dermatitis. Plaintiff was advised that to resolve the dermatitis, he should refrain from exposure to chemicals. Plaintiff was

referred to a neurologist for the shoulder pain and thumb numbness (Docket No. 11, p. 341 of 821).

On June 6, 2008, Plaintiff presented to Dr. Talih for treatment of depression with anxiety. Dr. Talih acknowledged that Plaintiff had polysubstance abuse, in remission.  Dr. Talih provided prescriptions for depression as well as a sleep aid (Docket No. 11, p. 311 of 821).

The X-rays of the left shoulder showed degenerative changes of the acromioclavicular joint on August 6, 2008 (Docket No. 463 of 821).

On April 2, 2009, Dr. Bruce Piszel, M. D., a pain management specialist, concluded that Plaintiff had lumbar spondylosis and neuritis.  Dr. Piszel prescribed a trial of Oxycodone, a synthetic opiod used to relieve pain, subject to Plaintiff's compliance with an opioid agreement (Docket No. 11, pp. 317-318 of 821; www.healthgrades.com/physician/dr-bruce-piszel).  On April 23, 2009, Plaintiff tested positive for cocaine and negative for opioids (Docket No. 11, pp. 319-321; 326-328 of 821).  On May 4, 2009, Dr. Piszel advised Plaintiff that he could no longer provide medical care because Plaintiff violated the law as well as the terms of the opiod agreement (Docket No. 11, p. 315 of 821).

On August 6, 2009, Dr. Ravi K. Chimalakonda, M. D., an internal medicine specialist, attributed complaints of dyspnea and chest tightness to uncontrolled hypertension and elevated glucose levels.  He prescribed medications used to control hypertension and type two diabetes and advised that Plaintiff should engage in light exercise.  On August 13, 2009, Plaintiff complained of malaise, fatigue and lack of focus.  Dr. Chimalakonda attributed the lack of energy to hypoglycemia and modified the dosage and the time during which the medication was taken (Docket No. 11, pp. 333; 336-337; 423; 459 of 821; www.healthgrades.com/physician/dr-ravi-chimalakonda).

On January 20, 2010, Dr. Chimalakonda modified Plaintiff's drug regimen, adding

Metformin; Norvasc, a medication used to treat hypertension; and Pravastatin, a medication used to reduce the risk of heart attack and stroke (Docket No. 11, pp. 330; 420; 458 of 821).

Plaintiff complained of dyspnea and on July 12, 2010, Dr. Chimalakonda opined that it was secondary to CHF and the CHF was secondary to uncontrolled hypertension.  Plaintiff's blood sugar significantly exceeded the reference range and his diabetes was largely uncontrolled. Immediately Dr. Chimalakonda started Plaintiff on Lasix and potassium (Docket No. 11, pp. 456; 524; 740 of 821).

The electrocardiogram administered on July 16, 2010, showed possible left atrial enlargement and septal infarct (Docket No. 11, p. 741 of 821).  The echocardiogram conducted on July 22, 2010, showed the following:

- Mildly enlarged left ventricle.
- Moderate systolic dysfunction.
- Mild mitral regurgitation.
- Mildly dilated left atrium.
- Mild aortic valve sclerosis.
- Mild pulmonary hypertension (Docket No. 11, p. 441 of 821).

The X-ray of the chest administered on July 22, 2010, showed cardiac enlargement but no acute process.  Plaintiff's blood sugar was elevated and Dr. Chimalakonda increased the dosage of insulin (Docket No. 11, pp. 454; 806 of 821).

On August 11, 2010, Dr. Brant provided a summary of his treatment history with Plaintiff. Records dating back to December 5, 2001, show that Dr. Brant provided drug therapy for Plaintiff's body pain (Docket No. 11, pp. 609-712 of 821).  In retrospect, Dr. Brant suggested that given the medication and the side effects of depression, Plaintiff was at risk (when performimng dangerous work and that he could not:

- Lift more than five pounds on an occasional basis.
- Stand or walk for more the 15 minutes at a time.

14

- Sit for more than 15 minutes at a time without shifting position or getting up to a change position.
- Bend, lift, carry, crawl, squat, climb stairs or climb ladders due to his back condition.

(Docket No. 11, pp. 443-444 of 821).

Plaintiff presented on November 18, 2010, for follow-up care regarding diabetes and CHF. Dr. Chimalakonda determined that Plaintiff's hypertension and CHF were stable and that abdominal bloating was likely attributed to lactose intolerance. Dr. Chimalakonda proceeded to lecture Plaintiff that control of his insulin-dependent diabetes should be a priority in his health maintenance. When Plaintiff presented to Dr. Chimalakonda on November 20, 2010, his blood sugar was elevated (Docket No. 11, pp. 447; 515 of 821).

The Bureau of Disability Determination (BDD) referred Plaintiff to Mr. Richard C. Halas, M.A., a clinical psychologist, for determination of current levels of adjustment and mental status to facilitate long-term disability. On January 3, 2011,Plaintiff drove himself to the appointment during which Mr. Halas conducted a clinical interview and mental status examination. Notably:

- Plaintiff was oriented in time, place and person.
- Plaintiff was not delusional.
- Plaintiff did not suffer from auditory or visual hallucinations.
- Plaintiff's insight and judgment were fair.
- Plaintiff's hands trembled during the interview, a sign of high levels of anxiety.
- Plaintiff claimed that he was paranoid as a result of his wife's infidelity.
- Plaintiff was concerned about his weight and water retention.
- Plaintiff had feelings of hopelessness, helplessness, guilt and worthlessness primarily resulting from his inability to care for his family.

Using the DSM to classify Plaintiff's mental illness and disorder, Mr. Halas determined that:

| AXIS | WHAT IT IS | WHAT IT MEASURES | MR. HALAS' APPLICATION TO PLAINTIFF |
|------|-----------|------------------|-------------------------------------|
| I | Clinical disorders. | This is what the clinician actually thinks of as the diagnosis | Depressive Disorder<br>Anxiety Disorder |

15

| II | Developmental disorders and personality disorders. | Developmental disorders include autism and mental retardation, disorders which are typically first evident in childhood. Personality disorders are clinical syndromes which have more long lasting symptoms and encompass the individual's way of interacting with the world. They include Paranoid, Antisocial, and Borderline Personality Disorders. | Mixed personal disorder, including paranoid schizoid and dependent traits. |
|---|---|---|---|
| III | Physical conditions. | Which play a role in the development, continuance, or exacerbation of Axis I and II Disorders. | Deferred for medical examination. |
| IV | Psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Unemployment, financial concerns, health concerns, dependency on others, wife's infidelities. |
| V | Highest level of functioning. | On the final axis, the clinician rates the person's level of functioning both at the present time and the highest level within the previous year. This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Plaintiff's overall GAF is 45 and his functional severity is 45, a score that denotes the presence of serious symptoms or serious impairment in social, occupational or school functioning. |

Mr. Halas considered the four work-related mental abilities and determined:

- Plaintiff's mental ability to follow through with simple instructions and/or directions remain intact and not impaired.
- Plaintiff's mental ability to maintain attention and concentration to perform simple, repetitive tasks is assessed as a mild impairment.
- Plaintiff's mental ability to relate to others is moderately impaired.
- Plaintiff's mental ability to withstand the stresses and pressures of day-to-day work activities is **marked**ly impaired.
- Plaintiff is able to manage funds in an appropriate, practical and realistic manner (Docket No. 11, pp. 602-606 of 821).

From March 14, 2011 through January 4, 2012, Dr. Brant copiously monitored Plaintiff's medication intake while providing treatment for, *inter alia*, back, elbow, leg and stomach pain; cold symptoms; cellulitis and depression (Docket No. 11, pp. 763-775; 784-794 of 821).

On June 14, 2011, Dr. Chimalakonda added NovoLog®, a fast-acting mealtime insulin, to the drug regimen (Docket No. 11, p. 778 of 821).

On November 9, 2011, Dr. Talih performed an overnight polysomnogram study and recommended that Plaintiff:

16

- Lose weight.
- Consider sleeping off back.
- Use of a dental device.
- Use of a positive airway pressure therapy (Docket No. 11, pp. 779-781 of 821).

Plaintiff was issued a disability placard on March 23, 2012[5] (Docket No. 11, p. 821 of 821).

### VI.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS.

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270, 274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].

---

[5]

In Ohio, an individual with a cardiac condition that affects functional limitations and is classified in severity according to standards set by the American Heart Association may obtain certification. Bmv.ohio.gov/disability placards.stm

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VII. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings of fact:

1.  Step one–Plaintiff met the insured status requirements of the Act through December 31, 2013.  He had not engaged in substantial gainful activity since February 1, 2009, the alleged onset date.

2.  Step two–The ALJ determined that Plaintiff had nine severe impairments:

    - Anxiety.
    - Cervical disc bulge.
    - Coronary artery disease status post double bypass.
    - Depression (major).

18

- Diabetes mellitus.
- Hypertension.
- Lumbar spondylosis.
- Obstructive sleep apnea.
- Poly-substance dependence.

3.  Step three--Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff had the residual functional capacity (RFC) to perform light work, except that he is limited to:

- Occasionally lifting up to 20 pounds.
- Frequently lifting/carrying up to 10 pounds.
- Standing/walking for about six hours.
- Sitting for up to six hours in an eight-hour workday with normal breaks.
- Unlimited pushing and pulling; frequent climbing of ramps or stairs, occasional climbing of ladders, ropes or scaffolds; occasional stooping.
- No strict production quotas, and only superficial interaction with co-workers, supervisors and the public.

4.  Step four--Plaintiff was able to perform his past relevant work as a precious metal coater as defined at DOT 705.684-038.

5.  Step five--Plaintiff was not under a disability as defined in the Act from February 1, 2009, through the date of the decision (Docket No. 11, pp. 17-27 of 821).

**VIII. STANDARD OF REVIEW.**

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  A district court's review is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).

"Substantial evidence" is evidence that a reasonable mind would accept to support a

conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).  The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  If there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Consequently, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  The ALJ's decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

### IX. ANALYSIS.

Plaintiff's challenge to the ALJ's decision is threefold:

1. The ALJ's finding that Plaintiff is capable of performing past relevant work is not supported by substantial evidence.
2. Substantial evidence does not support the ALJ's RFC finding.
3. The hypothetical questions posed to the VE are flawed.

Defendant responded that:

1. Even if the Commissioner notes that the DOT code that the VE identified requires an RFC for medium work, the ALJ's error is harmless because Plaintiff has failed to show that the error would have changed the ALJ's ultimate decision.
2. Plaintiff did not specifically challenge the ALJ's physical RFC determination and hypothetical questions to the extent that they were inconsistent with his RFC assessment.
3. The hypothetical questions adequately incorporated the limitations that were deemed credible by the ALJ.

**1.**     **PLAINTIFF'S PAST RELEVANT WORK.**

**PLAINTIFF ALLEGES THAT THE ALJ CONCLUDED HER EVALUATION OF PLAINTIFF'S CLAIM AT STEP FOUR WITH A FINDING THAT HE COULD RETURN TO HIS PAST RELEVANT WORK OF PRECIOUS METAL COATER. THIS FINDING IS NOT CONSISTENT WITH HIS RFC. DEFENDANT ARGUES THAT ALTHOUGH THE ALJ MAY BE MISTAKEN, PLAINTIFF HAS NOT MET THE BURDEN FOR A LOSING PARTY TO REVERSE THE ORIGINAL DECISION OF THE ALJ.**

Assuming that Plaintiff had engaged substantial gainful employment, the ALJ's well-articulated finding at step four of the sequential evaluation states that Plaintiff can return to his former job of a precious metal coder.  The problem with this conclusion is that the ALJ simultaneously found that Plaintiff had an RFC for light work.

Under DOT 705.684-038, the job of precious metal coder, as generally performed, requires medium exertion as follows:

> Exerting 20 to 50 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time) and/or 10 to 25 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or greater than negligible up to 10 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.

In fact, the physical demand requirements for a precious metal coder are in excess of that required for light work.

21

A conflict arises because the VE's testimony regarding the exertional level of a particular job–precious metal coder–is facially different from that stated in the DOT.  The description clearly states that the physical demand requirements for this job are in excess of those for light work (Docket No. 11, pp. 73; 74 of 821).  The occupational evidence provided by the VE was clearly not consistent with the occupational information supplied by the DOT and therefore in direct conflict with the information in the DOT.

Neither the ALJ nor counsel identified any potential conflict between the VE's testimony and the DOT.  Nor did the ALJ account for the inconsistency in the performance of the precious metal coder job as medium work and his finding that Plaintiff has an RFC for light work in the decision.  The ALJ found that the Plaintiff had ability to perform less than a full range of light work restricted to lifting up to 20 pounds occasionally, 10 pounds frequently, standing/walking for about six hour and sitting for up to six hours in an eight-hour workday with normal breaks.  According to the DOT, Plaintiff is unable to perform the occupation named by the VE because this occupation requires a medium level of exertion.

The VEs failure to resolve the conflict does not, in and of itself, render the ALJ's ruling unsupported by substantial evidence.  When there is a conflict between the VE's testimony and the DOT, S.S.R. 00–4p imposes a duty on the ALJ to resolve the conflict before relying on the evidence of the VE.  *Lindsley v. Commissioner of Social Security*, 560 F.3d 601, 603 (6th Cir.2009) (*citing* S.S.R. 00-4p, 2000 WL 1898704, \*4).  It states that when there is an obvious, unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  *Id.*  In these situations, the ALJ must ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT;

and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.  *Id.*

Here, the VE acknowledged at the commencement of the hearing that his testimony was consistent with DOT and that he would advise when it was not (Docket No. 11, p. 69 of 821).  The ALJ was probably unaware of the conflict between the VE's testimony and the DOT until he received all of the arguments and considered all of the medical evidence.  The ALJ's ruling is not unsupported by substantial evidence merely because he failed to resolve the conflict between the VE's testimony and the DOT.

Given the precise wording found in the DOT that the physical demand requirements for a precious metal coder exceed those for light work and the ALJ's RFC limitations, the testimony of the VE was especially probative in determining whether a particular RFC limitation was compatible with a corresponding DOT strength level.  Such erroneous characterization of the job's exertional requirements fails to accommodate Plaintiff's RFC, calling into question both the probative value and reliability of the VE's testimony.  Because the ALJ's decision is based on unreliable VE testimony, it is obvious that Plaintiff cannot return to his past work as a precious metal coder.  The ALJ's ruling that he can return to his past work as precious metal coder is not supported by substantial evidence.

This is not a case of harmless error.  Plaintiff had a clear and indisputable right to an accurate, reasonable and consistent interpretation of the statutes.  The ALJ elicited evidence about other jobs but denied benefits conclusively at step four of the sequential evaluation based on an inaccurate application of the rules.  The error that resulted had substantial and injurious effect or influence in determining that Plaintiff could return to his past work, thus prejudicing his case on its merits.  Plaintiff had set forth sufficient argument that correction of the ALJ's error could

conceivably change the ALJ's ultimate decision. The Magistrate recommends that the Court reverse and remand this case to the Commissioner to consider step four of the sequential evaluation.

### 2. ACCURACY OF THE RFC.

PLAINTIFF CHALLENGES THE ACCURACY OF THE ALJ'S RFC FINDING FOR THE REASONS THAT SHE FAILS TO ACCOUNT FOR INCONSISTENCIES BETWEEN DR. DERYCK RICHARDSON'S FINDINGS AND THE RFC. DEFENDANT ARGUES THAT FOR PURPOSES OF JUDICIAL REVIEW, PLAINTIFF HAS WAIVED THIS ISSUE FOR THE REASON THAT IT WAS NOT EXPLICITLY RAISED IN HER BRIEF TO THE APPEALS COUNCIL.

The Act provides that an individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, may obtain a review of such decision by a civil action filed in federal court. *Sims v. Apfel*, 120 S.Ct. 2080, 2083 (2000)(*citing* 42 U. S. C. § 405(g)). While the Act does not define "final decision," the Social Security Administration's regulations provide that where the Appeals Council denies a party's request to review an ALJ's decision, the ALJ's opinion becomes the final decision. *Id.* at 2083. If the Council denies the request for review, the ALJ's opinion becomes the final decision. *Id.* (*citing* 42 U.S.C. § 405(a); 20 C.F.R. §§ 404.900(a)(4)-(5), 404.955, 404.981, 422.210(a)). In *Sims*, the Supreme Court held that a social security claimant who has exhausted all administrative remedies **does not** waive judicial review of any issues not raised before the Appeals Council. *Id.* at 2082. The *Sims* Court did not address whether a claimant would waive judicial review by failure to raise an issue before the ALJ. *Id.* at 2083 (noting parenthetically that "[w]hether a claimant must exhaust issues before the ALJ is not before us.").

The Magistrate has not found any SSA regulations or precedent in this district that Plaintiff's failure to raise an objection to the RFC finding during the administrative hearing precludes judicial review. As a practical matter, Plaintiff could not have preserved an objection

to the RFC finding at the hearing because the ALJ had not rendered such decision.  Neither can the Magistrate ascertain if Plaintiff, when squarely presented with the opportunity to object to the characterization by the ALJ of her RFC, raised the issue in a brief filed in the Appeals Council.  Nevertheless, even if Plaintiff failed to challenge the RFC finding before the Appeals Council, he has not waived judicial review.

Turning to the merits of the challenge, Plaintiff argues that his RFC fails to account for and/or incorporate the opinions of State agency psychologist, Dr. Richardson; that the ALJ failed to explain the weight given to his opinions; and that the ALJ failed to account for the inconsistencies in her RFC and Dr. Richardson's decision.

State agency psychological consultants are highly qualified psychologists who are also experts in Social Security disability evaluation; therefore, an ALJ must consider findings of State agency psychological consultants as opinion evidence.  POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, 1996 WL 374180 (July 2, 1996).  While ALJs are not bound by the findings made by State agency psychologists, they may not ignore their opinions and they must explain the weight given to the opinions in their decisions.  *Id.*

Dr. Richardson reviewed the collected evidence to determine the existence and severity of Plaintiff's impairments, whether his impairments met or equaled a listing, and to determine Plaintiff's RFC.  He neither examined nor met Plaintiff personally.  Although Dr. Richardson's findings were considered evidence, the ALJ is not bound by such findings.  The ALJ followed the regulations, thereby fulfilling her duty to consider the findings of Dr. Richardson.  The ALJ

articulated that she afforded great weight to all of the state agency reviewing physicians (Docket No. 11, pp. 24-25 of 821). To the extent that Dr. Richardson's conclusions were consistent with medical evidence which accounted for Plaintiff's persistence and pace and social functioning deficits, the ALJ incorporated Dr. Richardson's findings that Plaintiff's RFC is restricted to work that did not involve strict production quotas and that his interaction with co-workers, supervisors and the public remain superficial (Docket No. 11, pp. 21; 106 of 821).

Because the ALJ applied the correct legal standards in assessing a state agency opinion, the Magistrate recommends that the Commissioner's decision be affirmed as to Plaintiff's second claim.

### 3. AN APPROPRIATE HYPOTHETICAL QUESTION.

**PLAINTIFF SUGGESTS THAT THE ALJ FAILED TO ACCURATELY DESCRIBE HIS INABILITY TO PERFORM WORK INVOLVING RAPID CHANGES. DEFENDANT ARGUES THAT FOR PURPOSES OF JUDICIAL REVIEW, PLAINTIFF HAS WAIVED THIS ISSUE FOR THE REASON THAT IT WAS NOT EXPLICITLY RAISED IN HER BRIEF TO THE APPEALS COUNCIL.**

The Magistrate has previously determined that an issue not presented to the Appeals Council is not specifically waived. Accordingly, consideration will be given to whether the hypothetical questions posed to the VE that omitted his inability to perform work involving rapid change accurately described Plaintiff's mental RFC.

At step five of the sequential evaluation, the burden shifts to the Commissioner to show that there are jobs existing in the national economy which can accommodate the claimant's RFC. *Dahlen v. Commissioner of Social Security*, 2014 WL 587139, *20 (N.D.Ohio,2014) (*citing Janda v. Commissioner of Social Security*, 2013 WL 3200611, *4 (N.D.Ohio, 2013). The Commissioner can satisfy this burden by showing "substantial evidence that a claimant has the vocational qualifications to perform specific jobs [.]" *Id. (citing O'Banner v. Secretary of Health Education*

& *Welfare*, 587 F.2d 321, 323 (6th Cir.1978)).  Substantial evidence may be produced through reliance on the testimony of a VE in response to a 'hypothetical' question, but only 'if the question accurately portrays plaintiff's individual physical and mental impairments.' "  *Id.* (*citing Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir.1987) (*citing Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir.1984)).

Only the hypothetical question containing the elements of the ALJ determined RFC must be asked.  Here, the ALJ articulated two hypothetical questions that precisely set out impairments that mirrored Plaintiff's limitations that were supported by substantial evidence.  Accepted as true by the ALJ, these concrete limitations accounted for Plaintiff's moderate limitations in concentration, persistence and pace.  The ALJ posed a hypothetical to the VE that properly included those mental limitations on Plaintiff's functional capacities that were consistent with the record as a whole.  The ALJ provided an opportunity for Plaintiff's counsel to cross-examine the VE, correct the hypothetical question or pose a hypothetical question.  The VE's testimony went unchallenged and there is no reversible error in relying on such unrefuted testimony.

**XI. CONCLUSION.**

For the foregoing reasons, the Magistrate recommends that:  (1) this case be reversed and remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for consideration/reconciliation at steps three and four of the sequential evaluation and to determine if Plaintiff is disabled; and (2) the Court terminate the referral to the undersigned.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  March 27, 2014

## XIII. NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation.  A party desiring to respond to an objection must do so within ten (10) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.